Youssef H. Hammoud, CA Bar No. 321934
**HAMMOUD LAW, P.C**
3744 E. Chapman Avenue, #F12269
Orange, California 92859
T: (949) 301-9692
F: (949) 301-9693
E: yh@lawhammoud.com

*Attorney for Plaintiff*
*Tyrea Cherry*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYREA CHERRY, | Case No.: |
| Plaintiff, | |
| vs. | **COMPLAINT AND DEMAND FOR JURY TRIAL FOR VIOLATIONS OF:** |
| EXPERIAN INFORMATION SOLUTIONS, INC., | 1. FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681 *et seq.* |
| Defendants. | 2. CCRAA, Cal. Civ. Code § 1785 *et seq.* |

## <u>COMPLAINT</u>

Tyrea Cherry ("Plaintiff" or "Ms. Cherry") a living, breathing thirty-two-year-old consumer, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian" or "CRA Defendant") and states as follows:

## **INTRODUCTION**

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the CRA Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e.,

retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.  Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.  One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.  The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We

are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed. *Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.    The FCRA and CCRAA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

10.    The FCRA and CCRAA also requires furnishers of information, a creditor or other third party that provides information about a consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding

a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of Experian's blatantly inaccurate credit reporting, wherein Experian reported to Plaintiff's potential creditors and to other third-parties that she is "deceased."

12.    Accordingly, Plaintiff brings the claim against Experian for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b) and Cal. Civ. Code § 1785.14(b).

## **PARTIES**

13.    Tyrea Cherry ("Plaintiff" or "Ms. Cherry") is a natural person residing in Los Angeles, Los Angeles County, California, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c) and Cal. Civ. Code § 1785.3(b).

14.    Defendant Experian is a *credit reporting agency*, as defined in 15 U.S.C. § 1681a(f) and Cal. Civ. Code § 1785.3(d). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing *consumer reports*, as defined in 15 U.S.C. § 1681a(d) and Cal. Civ. Code § 1785.3(c), to third parties. Experian can be served at its principal place of business

located at 475 Anton Boulevard, Costa Mesa, California, 92626.

15.    Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

## **JURISDICTION AND VENUE**

16.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17.    There is also supplemental jurisdiction because the state law claims arise from the same transaction or occurrence as the FCRA claim and are so related as to become part of the same case and controversy.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## **FACTS**

### **Summary of the Fair Credit Reporting Act**

19.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

22.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**The CRA Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

24.     The CRA Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

25.     Pursuant to 15 U.S.C. § 1681e(b) and Cal. Civ. Code § 1785.14(b), consumer reporting agencies, like Experian, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), and Cal. Civ. Code § 1785.11, consumer reporting agencies, like CRA Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate 'permissible purposes."

27.     CRA Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

28.     CRA Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" (Equal Credit Opportunity Act) field of an electronic data input format used in the credit reporting industry, known as Metro 2.

29.     CRA Defendant does not request or require a death certificate from

any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

30.    CRA Defendant does not request or require any proof whatsoever from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31.    CRA Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32.    In some cases, in order to assure accuracy, the CRA Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. CRA Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

33.    CRA Defendant regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers

that the government believes to be deceased. But the CRA Defendant does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

34.    CRA Defendant will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

35.    CRA Defendant fails to employ reasonable procedures that assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

36.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, the CRA Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

37.    Even in instances where the purportedly deceased consumer communicates directly with the CRA Defendant, the CRA Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that

consumer's report.

38.    Once a "deceased" mark is placed upon a consumer's report, the CRA Defendant will not calculate and will not provide a credit score for that consumer.

39.    Upon the CRA Defendant's report with a "deceased" mark sold to third parties, the CRA Defendant never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

40.    The CRA Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

41.    The CRA Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

42.    The CRA Defendant knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

43.    The CRA Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the CRA Defendant is inaccurately reporting them as "deceased" and without a credit score.

44.    The CRA Defendant has received and documented many disputes from consumers complaining that CRA Defendant had erroneously marked them as "deceased" on their credit reports.

45.    The CRA Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

46.    Nevertheless, the CRA Defendant does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

47.    Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance decides to change the code.

48.    CRA Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

49.    Nor does the CRA Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

50.    For years after a consumer's actual death, the CRA Defendant will continue to sell credit reports about that consumer.

51.     The CRA Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to it— meaning that no one is continuing to purchase reports about that consumer.

52.     The CRA Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

53.     The CRA Defendant profits from the sale of reports on deceased consumers.

54.     The CRA Defendant has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

55.     The CRA Defendant knows that truly deceased consumers do not apply for credit.

56.     The CRA Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the CRA Defendant to be a common and major source of identity theft.

57.     The CRA Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

58.    The CRA Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

59.    The CRA Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

60.    The CRA Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

61.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the CRA Defendant to sell their credit reports, absent a court order.

62.    The CRA Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Identifies the Deceased Notation on Her Credit File**

63.    In or around September 2021, Plaintiff noticed that CRA Defendant had placed a "deceased" notation on her credit file.

64.    Upon information and belief, non-party Capital One Bank furnished information to the credit reporting agencies indicating that Plaintiff was "deceased."

65.    CRA Defendant is the only credit reporting agency that accepted the inaccurate "deceased" designation.

66.    In or around September 2021, Plaintiff disputed the inaccurate reporting by CRA Defendant.

67.    Upon information and belief, CRA Defendant received Plaintiff's dispute regarding the inaccurate "deceased" notation.

68.    Upon information and belief, CRA Defendant corrected the inaccurate reporting and removed the "deceased" notation associated with the Plaintiff.

69.    In or around August 2022, Plaintiff obtained a copy of her credit reports from the three major credit reporting agencies, CRA Defendant and non-parties Trans Union and Equifax.

70.    Upon review, Plaintiff noticed that CRA Defendant was once again inaccurately reporting her as "deceased."

71.    Non-parties Trans Union and Equifax were not reporting the "deceased" notation on Plaintiff's consumer credit file.

72.    On more than one occasion in 2022, CRA Defendant published Plaintiff's credit information containing inaccurate information related to the "deceased" notation to third-party entities.

73.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

74.    As a result of the "deceased" notation, the CRA Defendant made it practically impossible for Plaintiff to continue to obtain credit.

75.    On at least one occasion, Plaintiff was denied credit due to the inaccurate reporting by CRA Defendant.

76.    On at least one occasion, Plaintiff was denied housing due to the inaccurate reporting by CRA Defendant.

77.    At all times pertinent hereto, CRA Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the CRA Defendant herein.

78.    At all times pertinent hereto, the conduct of CRA Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

79.    As a result of CRA Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; detriment to her credit rating; the expenditure of time, money, and labor disputing and trying to correct the inaccurate credit reporting; loss of sleep, headaches, and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF
## COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

80.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

81.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

82.    On numerous occasions, CRA Defendant Experian prepared patently false consumer reports concerning Plaintiff, failing to follow reasonable procedures to assure maximum possible accuracy.

83.    Despite actual and implied knowledge that Plaintiff is not dead, CRA

Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

84.    Further, CRA Defendant was in possession of information that Plaintiff was not "deceased" as she disputed the inaccurate information in or around September 2021 and CRA Defendant corrected the inaccurate information. However, in or around 2022, CRA Defendant reinserted the inaccurate information indicating that Plaintiff was "deceased."

85.    CRA Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

86.    As a result of CRA Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

87.    CRA Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, CRA Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. §

1681o.

88.    Plaintiff is entitled to recover attorneys' fees and costs from CRA Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## Violations of the California Consumer Credit Reporting Agencies Act (CCCRAA), CAL. CIV. CODE § 1785 *et seq.*

89.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint.

90.    Defendants violated Cal. Civ. Code § 1788.14(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff when preparing a consumer credit report.

91.    On numerous occasions, CRA Defendant Experian prepared patently false consumer reports concerning Plaintiff, failing to follow reasonable procedures to assure maximum possible accuracy.

92.    Despite actual and implied knowledge that Plaintiff is not dead, CRA Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

93.    Further, CRA Defendant was in possession of information that Plaintiff was not "deceased" as she disputed the inaccurate information in or around September 2021 and CRA Defendant corrected the inaccurate information.

However, in or around 2022, CRA Defendant reinserted the inaccurate information indicating that Plaintiff was "deceased."

94.    Consequently, Defendant is liable to Plaintiff for actual damages, punitive damages, and attorneys' fees and costs pursuant to Cal. Civ. Code § 1785.31.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Tyrea Cherry prays for the following relief:

A. Declaratory judgment that Defendant violated the FCRA;

B. Actual damages pursuant to 15 U.S.C. § 1681n(a) and 15 U.S.C. § 1681o(a)(1);

C. Statutory damages pursuant to 15 U.S.C. §1681n(a)(1)(A);

D. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

E. Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2);

F. Declaratory judgment that Defendant violated the CCRAA;

G. Actual damages pursuant CCRAA, Cal. Civ. Code § 1785.31(a)(1) and Cal. Civ. Code § 1785.31(a)(2)(A);

H. Punitive damages of $5,000.00 per violation pursuant to CCRAA, Cal. Civ. Code § 1785.31(a)(2)(B);

I. Costs and attorney's fees pursuant to CCRAA, Cal. Civ. Code §

1785.31(a)(1);

J.  Punitive damages to be determined at trial, for the sake of example and punishing defendants for their malicious conduct, pursuant to Cal. Civ. Code § 3294(a);

K.  Awarding Plaintiff any pre-judgment and post judgment interest as may be allowed under the law; and

L.  Any other relief that this Court may deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: September 26, 2023

> */s/ Youssef Hammoud*
> Youssef Hammoud, CA #321934
> HAMMOUD LAW, P.C.
> 3744 E. Chapman Ave., #F12269
> Orange, CA 92859
> T: (949) 301-9692
> F: (949) 301-9693
> E: yh@lawhammoud.com
>
> *Attorney for Plaintiff Tyrea Cherry*